Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
Panel II

| | | |
|---|---|---|
| ALPROEM ENGINEERING CONTRACTORS, CORP. Apelante | | Apelación procedente del Tribunal de Primera Instancia Sala de San Juan |
| v. | KLAN202300756 | Caso Núm. SJ2021CV02784 |
| FIRSTBANK PUERTO RICO, INC. Y OTROS Apelados | | Sobre: Daños y Perjuicios |

Panel integrado por su presidente, el Juez Bermúdez Torres, el Juez Adames Soto y la Juez Aldebol Mora

Adames Soto, Juez Ponente

## **SENTENCIA**

En San Juan, Puerto Rico, a 12 de diciembre de 2023.

Comparece Alproem Engineering Contractors Corp. (Alproem o el apelante), solicitando la revocación de una *Sentencia* emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan, (TPI), el 20 de junio de 2023. Mediante dicho dictamen, el foro primario declaró *Ha Lugar* una *Moción de Sentencia Sumaria* presentada por la parte demandada, FirstBank Puerto Rico Inc., (Firstbank o apelado), denegando a su vez la instada por Alproem, y en consecuencia, ordenando la desestimación y archivo de la causa de acción presentada por este último contra Firsbank.

La controversia ante nuestra consideración se enmarca en el contexto de una transferencia electrónica que Alproem adujo fue fraudulenta, causada por un jáquer, a través de la cual se logró la transferencia a favor de un tercero, de una importante suma de dinero proveniente de sus cuentas en Firsbank. Imputó responsabilidad Alproem a Firstbank en tal transacción, por presuntamente no tener o seguir medidas de seguridad comercialmente razonables, al amparo de la Ley de

Transacciones Comerciales, *infra*, que hubiesen evitado el resultado de tal acto.

## I. Resumen del tracto procesal

El 6 de mayo de 2021, Alproem Engineering Contractors Corp. (en adelante apelante o Alproem) instó una *Demanda* por daños y perjuicios en contra de: FirstBank; Bank of America, N.A. (en adelante, Bank of America); Compañía Aseguradora ABC (en adelante ABC); y John Doe y/o XYZ, Inc. En síntesis, adujo que, el 7 de mayo de 2020, uno de los socios fundadores de Alproem, el Señor Luis E. Ramírez (en adelante, señor Ramírez), le solicitó mediante correo electrónico a una asociada de contabilidad de esa misma corporación, la señora Lisandra Miranda Matos (en adelante, la señora Miranda), que transfiriera de la cuenta de ahorros núm. ***2162, a la cuenta de reserva núm. ***6953, la cantidad de $990,667.00 por concepto de "Desembolso de Préstamo". Se continuó alegando en la *Demanda*, que el dinero de dicha transacción fue producto del Programa de Protección de Pago de Cheques (PPP) que ofrece la Administración de Pequeños Negocios (SBA, por sus siglas en inglés), para que pequeñas empresas pudieran cubrir los gastos de nómina de sus empleados.

Sostuvo Alproem, además, que, el 8 de mayo de 2020, un tercero desconocido, y sin ningún tipo de relación con la corporación, fraudulentamente jaqueó el correo electrónico del señor Ramírez y le ordenó a la señora Miranda que transfiriera los $990,667.00 de la cuenta núm. ***6953, a una cuenta "Business Fundamentals Checkings" de Bank of America en la ciudad Mesa, Arizona. Acción que presuntamente se concretó.

Alproem aseveró en la demanda que, a pesar de lo narrado en el párrafo anterior, FirstBank, ni Bank of America, ejercieron los protocolos de seguridad necesarios para alertar rápidamente sobre la transferencia fraudulenta de fondos y así evitar la apropiación por parte de un tercero desconocido. En la misma tónica el apelante aseveró que, no fue hasta once

días después de realizada la transferencia aludida que Bank of America alertó a FirstBank de que dicha transacción se trataba de un posible caso de fraude. Añadió, que FirstBank se comunicó con Alproem por primera vez el 22 de mayo de 2020, a través de un correo electrónico, notificándole sobre la alerta de fraude emitida por Bank of America. En lo pertinente, le imputó a Firsbank, entre otros: haber fallado en ejercer una adecuada verificación, revisión de las actividades bancarias de Alproem y de evaluar todos los factores de riesgos antes de autorizar le mencionada transacción fraudulenta; no confirmar por vía telefónica o por ningún otro medio la veracidad de la transferencia electrónica, a pesar de tratarse de una transacción altamente irregular; conociendo el historial de transacciones bancarias de Alproem, FirstBank omitió su deber de cuidado mínimo para con Alproem.

A raíz de lo anterior, Alproem sostuvo que FirstBank y Bank of America incurrieron en actos culposos y negligentes que le provocaron una pérdida económica, ascendiente a $829,600.00, más una cantidad de $100,000 por concepto de daños y perjuicios.

Posteriormente, Alproem presentó un aviso de desistimiento voluntario, sin perjuicio, de su *Demanda* contra Bank of America, que el foro apelado acogió mediante *Sentencia Parcial*.

Por su parte, FirstBank presentó *Contestación a demanda*. Habiendo admitido ciertas alegaciones de la demanda, y negado otras, afirmó no haber incurrido en los actos u omisiones culposas o negligentes que se le atribuyeron en la *Demanda*. Enfatizó que de las propias alegaciones de la *Demanda* surgía que cualquier responsabilidad por la transferencia aludida se le debe atribuir a Alproem y/o terceros. En específico, aseveró que Alproem fue negligente al no implementar las medidas de seguridad apropiadas para evitar que terceros infiltraran en sus sistemas de información. Esgrimió, que una vez recibió el correo electrónico de la señora Miranda sobre la transferencia, se comunicó con ella por teléfono para confirmar, pero no la consiguió. De igual forma, FirstBank sostuvo que le

escribió por correo electrónico para confirmar la transacción, solicitando la dirección física del beneficiario y el propósito de la transacción. Sobre esto, indicó que en menos de una hora recibió respuesta de la señora Miranda con la información solicitada y reiterando la transferencia. Finalmente, FirstBank alegó que, el 26 de mayo de 2020, Alproem firmó un relevo de responsabilidad en el cual liberó a FirstBank de toda responsabilidad.

Luego, y superadas varias instancias procesales relativas al descubrimiento de la prueba, el tribunal *a quo* emitió otra *Sentencia Parcial,* esta vez acogiendo una solicitud de desistimiento *con perjuicio* de Alproem, en cuanto a la causa de acción sobre responsabilidad civil extracontractual dirigida contra Firstbank. De este modo, el único reclamo incluido en la causa de acción presentada que subsistió fue el de la alegada pérdida sostenida por la transferencia fraudulenta, la cual ascendía a $829,600.

Culminado el descubrimiento de prueba, FirstBank presentó una *Moción de Sentencia Sumaria.* Al tenor, propuso ciento ocho (108) hechos como incontrovertidos, con alusión a la prueba documental que presuntamente los sustentaban. En discusión de derecho, arguyó sobre el relevo de responsabilidad suscrito por las partes respecto a la controversia alzada por Alproem. Elaboró sobre la ausencia de causa de acción de Alproem al considerarse el articulado relativo a la Ley de Transacciones Comerciales, *infra.* Particularmente, sostuvo que, según dicho estatuto, la orden de pago resultaba válida de haber sido autorizada por el remitente, y en este caso, eso fue lo ocurrido, en tanto intervino la autorización de Alproem a través de la señora Miranda, persona autorizada a esos efectos. Esgrimió que, aunque lo dicho disponía de la controversia, en cualquier caso, Firstbank sí estableció unos procedimientos de seguridad comercialmente razonables, consistentes en no menos de cinco distintos mecanismos de seguridad, entre estos: la designación de usuarios autorizados y la segregación de funciones por usuarios autorizados. Finalmente, FirstBank manifestó haber seguido todos los procedimientos

de seguridad establecidos en sus manuales y que, de haber algún tipo de responsabilidad, esta sería exclusivamente atribuible a Alproem, por no tomar las medidas de seguridad necesarias para proteger sus sistemas informáticos de actos fraudulentos.

A su vez, el mismo día Alproem también presentó su *Moción de Sentencia Sumaria*. Inició por afirmar que a ese punto ya se contaba con una serie de hechos estipulados, que permitían disponer de la controversia pendiente de manera sumaria. A tales efectos, afirmó que no existía controversia sustancial de que FirstBank quebrantó su deber contractual con Alproem al no cumplir con sus medidas de seguridad establecidas. Entonces, pasó a enumerar quince (15) hechos *esenciales y pertinentes* que identificó como incontrovertidos. En la discusión de derecho, entre otros asuntos, argumentó que la Ley de Transacciones Comerciales, *infra*, les exige a las instituciones bancarias protocolos de seguridad para proteger las órdenes de pago de sus clientes, a los que FirstBank hizo caso omiso. Sostuvo que FirstBank incumplió su protocolo de seguridad, pues el *Cash Management Procedure Manual* de FIS, le requería una confirmación telefónica de las transacciones sospechosa, pero FirstBank realizó dicha confirmación mediante correo electrónico. Esgrimió que FirstBank incumplió con sus políticas de seguridad, al solicitar la confirmación de orden de pago a la misma persona que la inició, en este caso la señora Miranda, contrario al *Commercial Transaction Banking Terms & Conditions* (en adelante "Terms & Conditions").

Así las cosas, FirstBank presentó su *Oposición a solicitud de Sentencia Sumaria* presentada por Alproem. En esta, sostuvo que la solicitud de Alproem se debía declarar *No ha Lugar*, pues: (1) la señora Miranda autorizó la Orden de Pago, por lo que resultaba innecesario entrar en los procedimientos de seguridad de FirstBank; (2) FirstBank confirmó la Orden de pago con la misma persona que la generó, porque así Alproem le instruyó a proceder; (3) el argumento de que la cuenta donde salió la orden

de pago que termina en ***6953 no estaba autorizada, va en contra de sus propios actos.

Ese mismo día, el 23 de marzo de 2023, Alproem presentó *Oposición a sentencia sumaria.* En síntesis, expuso que existe una controversia respecto a los hechos relacionados a la reunión de orientación que FirstBank llevó a cabo para ofrecer sus productos. Además, planteó que permanecía en controversia los *Terms & Conditions*, los cuales establecen segregación de funciones y prohíbe la confirmación de una orden de pago por la misma persona que la generó. Por otro lado, insistió sobre su planteamiento de que FirstBank debió cumplir con el procedimiento de confirmación de órdenes de pago por medio de una llamada telefónica y/o correo electrónico del listado de usuarios autorizados. Asimismo, argumentó que el relevo que firmó el señor Ramírez era un contrato de adhesión, el cual debía ser interpretado a favor de la parte más débil. Finalmente, reiteró que FirstBank no acató sus propios protocolos de seguridad establecidos para la plataforma de banca electrónica, y por tal razón no evitó el fraude y los daños ocasionados en la pérdida de casi un millón de dólares a Alproem.

Habiendo considerado las mociones dispositivas presentadas por las partes, el TPI dictó Sentencia Sumaria cuya revocación se nos solicita, declarando *Ha Lugar* la Moción de Sentencia Sumaria presentada por FirstBank, y desestimando la única causa de acción pendiente de adjudicar instada por Alproem. Al así decidir, el foro primario enumeró veintidós hechos materiales que no estaban en controversia.  En específico, el TPI determinó que los siguientes hechos materiales no estaban en controversia.

1. Alproem ha tenido varias cuentas comerciales con FirstBank desde el 24 de octubre de 2001.

2. FirstBank visitó las instalaciones de Alproem para darle asesoramiento relacionado a sus productos, contestar dudas y preguntas, y recopilar información e instrucciones del Alproem, las cuales FirstBank utilizó para personalizarle a Alproem la plataforma digital.

3. El 24 de octubre de 2012, Alproem y FirstBank otorgaron el (F.A.C.I.L.) FirstBank Access and Control Information Link Agreement (en

adelante, FACIL AGREEMENT), por virtud del cual FirstBank le habilitó a Alproem acceso a su plataforma de banca comercial digital.

4. El 24 de abril de 2015, la adenda de usuario del Smart Cash Management Solutions Product Agreement, suscrito por las partes y ejecutada en esa misma fecha, autorizó y proveyó códigos de acceso y contraseñas a la Sra. Miranda para que pudieran realizar, en el Sistema de Smart Cash Management Solutions, las siguientes funciones: (1) balance reporting; (2) stop payment (3) ACH (input & approval) ; (4) money transfers (input & approval); (5) eStatements; (6) book transfers.

5. En la adenda de usuario con fecha de 24 de abril de 2015, Alproem le asignó a la Sra. Miranda, al Sr. Rafael Rivera y a la Sra. Maricarmen Díaz, las funciones de iniciar y aprobar las transacciones monetarias, como método de verificación de autenticidad de órdenes de pago.

6. FirstBank contaba con los siguientes procedimientos de seguridad: (1) designación de usuarios autorizados; (2) segregación de funciones entre sus usuarios autorizados; (3) designación de un nombre de usuario y contraseña; (4) un sistema de doble verificación de autenticación en el que se utilizaba un token físico; (5) topes monetarios; (6) monitoreo de transacciones y validación adicional.

7. FirstBank recomendó a Alproem mediante el documento Commercial Transaction Banking & Conditions no asignar funciones de inicio y aprobación de transferencias monetarias a una sola persona autorizada.

8. Para mayo de 2020, Alproem mantenía las cuentas ***2162 y ***6953 con FirstBank.

9. Para mayo de 2020, Alproem obtuvo la cantidad de $990,667.00 en concepto de préstamo a través de Paycheck Protection Program ("PPP") que ofrece Small Business Administration ("SBA") préstamo número 4782647207.

10. El 7 de mayo de 2020, Lisandra Miranda transfirió electrónicamente desde la cuenta número ***262 hacia la cuenta número ***6953 la cantidad de $990,667.00.

11. La orden de pago objeto de este litigio fue realizada por Lisandra Miranda ("Miranda") el 8 de mayo de 2020 para hacer una transferencia cablegráfica ("wire transfer") por la cantidad de $990, 667.00 desde la cuenta ***693 de Alproem hacia la cuenta de 457040822406 de la sucursal de Bank of America en Mesa, Arizona, a nombre de "Larry P. Wiley".

12. El 11 de mayo de 2020, personal de FIS, el proveedor de servicios de monitoreo de transacciones de FirstBank, le escribió un correo electrónico al FACIL Team de FirstBank para que verificaran "[t]he Wire activity in the amounf of $990,667 from today as well as any other recent trasactions. Reason for Escalation: New Payee".

13. En su correo electrónico del 11 de mayo de 2020, el personal de FIS expresó que la Orden de Pago había sido "held".

14. El *Cash Management Procedure Manual* en su inciso 1.3 establece que el cliente, debe ser contactado al número telefónico y/o al correo electrónico que aparece disponible en la base de datos, cuando es necesaria una confirmación de transferencia cablegráfica, cuando esta se encuentra "held".

15. El 11 de mayo de 2020, personal del FACIL Team de FirstBank le remitió un correo electrónico a Miranda solicitando que confirmara la Orden de Pago, proveyera la dirección física del beneficiario e informara el propósito de la transacción.

16. Miranda replicó al correo electrónico escribiendo el nombre del beneficiario, Larry P. Wiley, proveyendo su dirección física e informando el propósito de la transacción.

17. El 22 de mayo de 2020, Bank of America se comunicó con FirstBank mediante un mensaje electrónico interbancario indicándole que tenía una sospecha sobre la transferencia electrónica.

18. El 22 de mayo de 2020, FirstBank le remitió a Alproem el mensaje de Bank of America vía correo electrónico enviado a Maricarmen Díaz y Lisandra Miranda.

19. El 22 de mayo de 2020, Alproem y FirstBank suscribieron un contrato titulado *Hold Harmless and Indemnification Agreement.*

20. El 22 de mayo de 2020, FirstBank le escribió un mensaje interbancario a Bank of America informándole que Alproem confirmó que la Orden de Pago no procedía, por lo que le solicitó la devolución de los fondos "lo más pronto posible".

21. El 3 de junio de 2020, FirstBank le notificó a Alproem que Bank of America estaba realizando una investigación y que esta podría durar hasta (90) días.

22. El 17 de febrero de 2021, la SBA condonó a Alproem el préstamo número 4782647207.

Alproem presentó una *Moción de Reconsideración*, que resultó denegada por el foro apelado.

Inconforme, Alproem comparece ante este Tribunal de Apelaciones, mediante el *Recurso de apelación*, señalando la comisión de los siguientes errores por el tribunal *a quo*:

A. El TPI erró al determinar que los procedimientos de FirstBank son comercialmente razonables según la Ley de Transacciones Comerciales.

B. El TPI erró al determinar que FirstBank cumplió con los procedimientos de seguridad establecidos.

En respuesta, FirstBank presentó su *Alegato en Oposición al recurso de Apelación.* Esgrimió que procede la confirmación de la *Sentencia* apelada, por las siguientes razones: (1) FirstBank no tenía que confirmar la orden de pago (*Wire*) con una persona distinta a la señora Miranda; (2) no había un deber por parte de FirstBank de confirmar la orden de pago (*Wire*) a través de una llamada telefónica; (3) el FACIL User Guide traído a colación por la parte apelante no guarda relación con la controversia en el

presente caso; (4) la carencia de controles internos por parte de Alproem imposibilita responsabilizar a FirstBank por el alegado incidente de fraude.

Estamos en posición de resolver.

## II. Exposición de Derecho

### A. La función apelativa ante la Sentencia Sumaria dictada por el Tribunal de Primera Instancia

El propósito de las Reglas de Procedimiento Civil es proveer a las partes que acuden a un tribunal una "solución justa, rápida y económica de todo procedimiento". 32 LPRA Ap. V, R.1; *González Santiago v. Baxter Healthcare*, 202 DPR 281, 290 (2019); *Roldan Flores v. M. Cuebas et al.,* 199 DPR 664, 676 (2018); *Rodríguez Méndez et al. v. Laser Eye,* 195 DPR 769, 785 (2016), *Oriental Bank v. Perapi et al.*, 192 DPR 7, 25 (2014). Procede dictar sentencia sumaria si "las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas y alguna otra evidencia si las hubiere, acreditan la inexistencia de una controversia real y sustancial respecto a algún hecho esencial y pertinente y, además, si el derecho aplicable así lo justifica". Regla 36 de Procedimiento Civil, 32 LPRA Ap. V. R. 36; *González Santiago v. Baxter Healthcare,* supra; *Roldan Flores v. M. Cuebas et al.,* supra; *Lugo Montalvo v. Sol Meliá Vacation,* 194 DPR 209, 225 (2015), *SLG Zapata-Rivera v. J. F. Montalvo*, 189 DPR 414, 430 (2013).

Al revisar sentencias dictadas por Tribunal de Primera Instancia mediante el mecanismo de la sentencia sumaria, o las resoluciones denegatorias de una moción de sentencia sumaria, el Tribunal de Apelaciones se encuentra en la misma posición que el tribunal inferior para evaluar su procedencia. *Meléndez González et al. v. M. Cuebas*, supra. Al disponer de una moción de sentencia sumaria, el tribunal necesariamente tendrá que escudriñar las alegaciones de la demanda o las defensas interpuestas para determinar si existen hechos en controversia que deban esclarecerse mediante un juicio. *León Torres v. Rivera Lebrón*, supra. Los criterios para seguir por este foro intermedio al atender la revisión de una

sentencia sumaria dictada por el foro primario han sido enumerados con exactitud por nuestro Tribunal Supremo. *Íd.* Según los tales, el Tribunal de Apelaciones debe:

1) examinar de *novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra,* y la jurisprudencia le exigen al foro primario;

2) revisar que tanto la moción de sentencia sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36, *supra*;

3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos;

4) y de encontrar que los hechos materiales realmente están incontrovertidos, debe proceder a revisar de *novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia.

Además, al revisar la determinación del TPI respecto a una sentencia sumaria, estamos limitados de dos maneras: (1) solo podemos considerar los documentos que se presentaron ante el foro de primera instancia; (2) solo podemos determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y si el derecho se aplicó de forma correcta. *Meléndez González, et al. v. M. Cuebas*, supra. El primer punto se enfoca en que las partes que recurren a un foro apelativo no pueden litigar asuntos que no fueron traídos a la atención del foro de instancia. Mientras que el segundo limita la facultad del foro apelativo a revisar si en el caso ante su consideración existen controversias reales en cuanto a los hechos materiales, pero no puede adjudicarlos. *Íd.,* pág. 115. También, se ha aclarado que al foro apelativo le es vedado adjudicar los hechos materiales esenciales en disputa, porque dicha tarea le corresponde al foro de primera instancia. *Vera v. Bravo*, 161 DPR 308, 335 (2004).

**B. Ley de Transacciones Comerciales (LTC)**

Con la aprobación de la Ley de Transacciones Comerciales de Puerto Rico (LTC), Ley Núm. 208 de 17 de agosto de 1995, según enmendada, 19 LPRA § 1105 et seq., se incorporaron las disposiciones federales

establecidas por los Artículos 1, 3, 4 y 4A del Uniform Commercial Code (UCC), en cuanto a los procedimientos bancarios, instrumentos negociables y transacciones comerciales. A consecuencia de esto, las disposiciones aplicables a los procedimientos bancarios, así como las normas generales y de interpretación sobre las relaciones entre los bancos y sus clientes se encuentran dispuestas en la LTC.

La Sección 4-103 de la LTC, *supra*, define *orden de pago* como:

> Una instrucción del remitente a un banco receptor, transmitida verbalmente, electrónicamente, o por escrito, para que pague, u ordene que otro banco pague, una cantidad de dinero fija o determinable a un beneficiario, si:
> (i) la instrucción no indica otra condición de pago al beneficiario que no sea el momento de pago,
> (ii) el banco receptor ha de ser reembolsado mediante un cargo a una cuenta del remitente, o mediante otra forma de pago por el mismo, y
> (iii) la instrucción es transmitida por el remitente directamente al banco receptor o a un agente, sistema de transferencias de fondos o sistema de comunicación, para transmisión al banco receptor. 19 L.P.R.A. § 1023.

De igual forma, la Sección 4-104 del mismo estatuto define *transferencia de fondos* como:

> Una serie de transacciones, comenzando con la orden de pago del originador, efectuadas con el propósito de pagarle al beneficiario de la orden. El término incluye toda orden de pago emitida por el banco del originador o por un banco intermediario, con intención de llevar a cabo la orden de pago del originador. Una transferencia de fondos se completa mediante la aceptación por el banco del beneficiario de una orden de pago a favor del beneficiario de la orden de pago del originador. 19 L.P.R.A. § 1024.

Por su parte, la Sección 4-201 de la LTC define *procedimiento de seguridad* de la siguiente forma:

> un procedimiento **establecido por un acuerdo entre un cliente y un banco receptor** para (i) verificar que una orden de pago o comunicación que enmienda o cancela una orden de pago **sea la orden del cliente**, o (ii) **detectar errores en la transmisión o contenido de la orden de pago o comunicación.** El procedimiento de seguridad puede requerir el uso de algoritmos u otros códigos, palabras o números de identificación, métodos crípticos, corroboración telefónica u otros sistemas de seguridad similares. La comparación de una firma en la orden de pago o comunicación con una firma registrada del cliente no constituye, de por sí, un procedimiento de seguridad. 19 L.P.R.A. § 1051.

Además, sobre las *órdenes de pago autorizadas y verificadas,* la Sección 4-202 de la LTC dispone lo siguiente:

(a) Una orden de pago recibida por el banco receptor es la orden autorizada de la persona identificada como remitente si esa persona autorizó la orden o está en alguna otra forma obligada por ella bajo el derecho que rige el mandato.

(b) Si un banco y su cliente han acordado que la autenticidad de las órdenes de pago emitidas al banco a nombre del cliente como remitente serán verificadas de acuerdo con un procedimiento de seguridad, una orden de pago recibida por el banco receptor será efectiva como orden del cliente, esté tal orden autorizada o no, si **(i) el procedimiento de seguridad es uno comercialmente razonable para proveer seguridad contra órdenes de pago no autorizadas, y (ii) el banco prueba que aceptó la orden de pago de buena fe y en cumplimiento con el procedimiento de seguridad y todo otro acuerdo escrito o instrucción del cliente que restrinja la aceptación de órdenes de pago emitidas en su nombre.** El banco no está obligado a cumplir con una instrucción que contravenga un contrato escrito con el cliente o de la que no tenga aviso en un plazo y de tal manera que le conceda al banco una oportunidad razonable para actuar respecto a ella antes de aceptar la orden de pago.

(c) La razonabilidad comercial de un procedimiento de seguridad es una cuestión de derecho a resolverse tomando en consideración los deseos expresados por el cliente al banco, las circunstancias del cliente conocidas por el banco incluyendo el monto, clase, y frecuencia normal de emisión de sus órdenes de pago al banco, los procedimientos de seguridad alternos ofrecidos al cliente, y los procedimientos de seguridad en uso general por clientes y bancos receptores en situación similar. **Se considerará como comercialmente razonable un procedimiento de seguridad si (i) fue escogido por el cliente luego del banco ofrecer, y el cliente rehusar, un procedimiento de seguridad que era comercialmente razonable para ese cliente, y (ii) el cliente expresamente acordó por escrito quedar obligado por cualquier orden de pago, ya sea esta autorizada o no, que fuese emitida en su nombre y aceptada por el banco en cumplimiento con el procedimiento de seguridad escogido por el cliente.** 19 L.P.R.A. § 1052.

(Énfasis provisto).

## III. Aplicación del Derecho a los hechos

a.

Según hemos advertido, la Sentencia apelada fue dictada a través del mecanismo procesal que provee la Regla 36 de Procedimiento Civil, *supra,* la sentencia sumaria. De ordinario, y por causa de que la revisión de los dictámenes sumarios provenientes de los foros primarios por este Tribunal

de Apelaciones acontece *de novo*, antes de atender los planteamientos de derecho esgrimidos por las partes, nos damos a la tarea de examinar si las mociones dispositivas ante la atención del tribunal *a quo* cumplieron con las formalidades requeridas para ponerlo en posición de atenderlas, y entonces verificar que los hechos propuestos por las partes como esenciales e incontrovertibles lo sean, es decir, si fueron sustentados por la prueba documental anejada a las mociones.

Vistas las mociones dispositivas de las partes en este caso, en efecto, juzgamos que cumplieron con los requerimientos formales para colocar en posición al TPI, y a este foro intermedio, de entrar en su contenido.

Señalado lo anterior, notamos, sin embargo, que en el recurso de apelación ante nuestra consideración Alproem no cuestionó las determinaciones de hechos incontrovertidos realizadas por el TPI en el dictamen apelado. Al contrario, Alproem destinó la totalidad de la argumentación al señalamiento de por qué, desde su óptica, el TPI incidió al aplicar el derecho a tales hechos. Por tanto, siendo que nuestra labor adjudicativa se ve limitada esencialmente a la discusión de los errores que planteen en sus escritos las partes que promueven la revisión apelativa, no encontramos razones para modificar de forma alguna la enumeración de los hechos incontrovertidos hecha por el foro apelado. En atención a lo cual, reiteramos, nos limitaremos a discutir los errores de derecho levantados por Alproemn en el *Recurso de apelación* que radicó.

b.

Al discutir el primer señalamiento de error Alproem parte de la premisa legal, correcta, de que Firstbank *tenía que contar con un procedimiento comercialmente razonable para proveer seguridad contras las órdenes de pago no autorizadas*, pero entonces concluye, de manera incorrecta, que *resulta evidente* dicho banco *no ejerció cautela ni razonabilidad alguna al manejar la transacción que claramente resultaba altamente sospechosa.* Al hacer este argumento Alproem pone el acento en

que, por la prolongada relación que había sostenido con Firstbank, esta institución debió percatarse de que la emisión de orden de pago resultaba altamente sospechosa, en consideración a que: involucró a un beneficiario nuevo; dirigida hacia un banco fuera de la jurisdicción de Puerto Rico; por una cantidad mucho más alta de lo normal; desde una cuenta de la cual nunca se había hecho una transacción electrónica.

Sin embargo, muy al contrario de lo esgrimido por Alproem, los hechos establecidos como incontrovertidos por la prueba documental presentada en las respectivas mociones dispositivas, lo que logran demostrar es que los mecanismos de seguridad establecidos por Firstbank sirvieron para advertir de manera oportuna sobre la transacción sospechosa, y esta entidad bancaria actuó con premura, siguiendo el protocolo establecido para tratar de evitarla, dando lugar a un proceso de verificación de su legitimidad. En este sentido, lo correcto es que Firsbank logró identificar la transacción como irregular, lo que precisamente dio lugar a la activación del proceso de verificación con la persona autorizada por Alproem para tal propósito, ocurriendo la autorización final solo después de superadas las medidas de seguridad establecidas entre las partes.

La cautela ejercida por Firstbank al confrontarse con la transacción sospechosa quedó ilustrada a través de la sucesión de los hechos establecidos como incontrovertidos por el TPI, (no cuestionados ante nosotros), que, en apretada síntesis, demostraron que: la señora Miranda, persona autorizada por Alproem para originar y aprobar transacciones monetarias en representación de esta ante Firstbank, originó, autorizó y confirmó la orden de pago (Wire) objeto del litigio, luego de que FirstBank levantara bandera roja y solicitara de parte de Alproem una confirmación escrita para completar el mismo. En efecto, al notar la anomalía en la transacción aludida, el sistema de monitoreo de FirstBank que se encargaba de evaluar las transacciones a base del historial del cliente,

congeló la transacción, y requirió la confirmación manual de un agente autorizado por Alproem. La confirmación fue provista por la señora Miranda, quien, aunque resulte reiterativo, era una de las agentes autorizadas por Alproem para tal propósito. No es una controversia que, habiendo advertido Firstbank a Alproem de la transacción sospechosa, aguardó hasta obtener la confirmación de dicha transacción por la representante de Alproem para entonces autorizarla.

Obsérvese que era en Alproem, como parte demandante, en quien residía la carga probatoria para establecer que Firstbank *no ejerció cautela al manejar la transacción que resultó altamente sospechosa,* pero la prueba documental ante nuestra consideración resultó insuficiente en derecho para lograr tal propósito, y, en cualquier caso, sirvió para establecer lo contrario.

b.

Como segundo señalamiento de error, la parte apelante esgrime que el foro primario incidió al concluir que FirstBank cumplió con los procedimientos de seguridad establecidos por ley. A contrario *sensu,* Alproem afirma FirstBank incumplió con las obligaciones relativas a la seguridad de la transacción porque: este no podía confirmar la orden de pago (*Wire*) a través de la misma persona que la generó; el *Cash Management Procedure Manual,* y el mensaje que recibió de Bank of America, le requerían a FirstBank confirmar la orden de pago (*Wire*) por teléfono; FirstBank no le produjo el *FACIL User Guide* durante el descubrimiento de prueba, lo que suponía un incumplimiento contractual que le impedía a FirstBank unilateralmente imponerle requisitos operacionales. No nos persuade.

En la sección siete del *Commercial Transaction and Banking Terms & Conditions* se establece que:

> FirstBank may require confirmation of Wire Transfer Payment orders. Customer and Bank shall agree on the method of confirming Wire Transfer payment orders received from customer. Customer shall designate Authorized Users to confirm Wire Transfer payment methods. Bank **recommends**

a minimum of three potential Authorized Users to confirm Wire Transfer payment orders and that Authorized Users serve as an initiator or a confirmer, but not both. **Customer may change the Authorized Users appointed under this agreement**.

[...]

**The confirmation of Wire Transfer payment orders initiated by Customer through the System shall be verified and approved by Customer prior to their transmission to Bank**. All System Wire Transfer payment orders shall be **initiated in accordance with the security procedures established for the System.** (Énfasis provisto).[1]

Luego, en la sección ocho del mismo documento, titulado *Wire Transfer Notifications,* se indica lo que sigue:

Wire Transfer Notifications to Customer for outgoing Wire Transfer incoming Wire Transfers, or Wire Transfer payment order rejections **will be done through the System or by telephone.** (Énfasis provisto)[2].

Además, en el *Cash Management Procedure Manual,* ya citado, se manifiesta lo siguiente:

**Due to the immediacy of wires, if an alert is generated wires go into HELD status until transaction is confirmed.** Bank is able to view wires and release them if necessary. If the **wire** is deemed to be fraudulent, it goes into the rejected state. For ACH transactions the bank only can cancel the transaction, if it's deemed fraudulent, if the BeB ACH cut has not occurred. For security purpose transactions can only be confirmed by one of the authorized users listed on the system. **User must be contacted using the phone number and emails available in BeB**. (Énfasis provisto).[3]

Con relación al primer argumento esgrimido por el apelante, atinente a la autorización y aprobación del *Wire* aludido, podemos ver que el *Commercial Transaction and Banking Terms & Conditions* recomienda un mínimo de tres usuarios autorizados para autorizarlo o confirmarlo. Sin duda, en el mismo documento se dispone que un usuario no debe ejercer ambas labores. No obstante, tal documento también establece que el cliente **tiene la libertad de cambiar los usuarios autorizados en el acuerdo entre las partes,** tal como lo subrayamos al citarlo. Asimismo, y

---

[1] Anejo 5 del Recurso, pág. 0395.
[2] *Íd.*
[3] Anejo 5 del Recurso, pág. 0382.

continuando con el mismo documento, en este se establece que, previo a la orden de pago, el cliente debe verificar y aprobar la transferencia, antes de someter la orden al banco, y que las mismas deben iniciarse de acuerdo con los procedimientos acordados. Finalmente, allí se dispone que las notificaciones de las órdenes de pago (*Wires*) deben hacerse a través del sistema o por teléfono y que, de haber alguna alerta, la transacción será detenida hasta que se provea una confirmación del cliente a través de un agente autorizado.

A raíz de lo anterior, nos queda claro que, tal como lo proveía el *Commercial Transaction and Banking Terms & Conditions*, Firstbank recomendó separar el agente que efectuaba la autorización del *Wire* del que la confirmaba, pero Alproem seguía en posición de disponer que la misma persona hiciera ambas funciones, según lo hizo. Sobre lo mismo, no pasa por inadvertido que FirstBank visitó el establecimiento de Alproem para recopilar información y proveer instrucciones sobre su plataforma digital, y, conforme a dichas instrucciones, Alproem otorgó un documento por virtud del cual designó a los usuarios autorizados y segregó sus funciones. En este documento, la segregación de funciones excluyó a la señora Miranda de realizar *"Book Transfers"*. Sin embargo, tres años más tarde, el 24 de abril de 2015, Alproem enmendó la designación de usuarios, autorizando a todos a ejercer las mismas labores. FirstBank alega desconocer la razón detrás del cambio de autorización. No obstante, queda claramente evidenciado en el expediente que, FirstBank cumplió en proveer y orientar a Alproem sobre las medidas de seguridad, y cumplió con ejecutar las mismas, según lo acordado por las partes como método de confirmación de transferencia de pagos. La decisión de otorgar los mismos permisos a todos los agentes autorizados, eliminando así la segregación de labores, fue una hecha unilateralmente por Alproem, contraria a las recomendaciones hechas por FirstBank, pero concebida dentro de las posibilidades acordadas por las partes.

Por otro lado, en cuanto a la alegación de que se debía contactar al cliente por teléfono y por correo electrónico confirmando la transacción, juzgamos que tal afirmación no se sostiene con la documentación presentada. Esto, por cuanto la sección de Normas Departamentales del *Cash Management Procedure Manual*, citada por Alproem, aludía específicamente a las transacciones de ACH, y no a los *Wire* transfers, nos explicamos. Según citamos del *Commercial Transaction and Banking Terms & Conditions*, allí se hizo una distinción entre "wire transfers" y "ACH transaction", siendo ambas órdenes de pago, pero se diferencian en cómo procesalmente se efectúan. La indicación de que el usuario debía ser contactado por vía telefónica y por correo electrónico, refería a las estipulaciones de transacciones ACH, pero no a los *Wire transfers*. De aquí que la notificación que hiciera Firstbank a Alproem mediante correo electrónico resultara suficiente, según el acuerdo alcanzado por las partes.

Por otra parte, el *Electronic Code of Federal Regulations* define las transferencias ACH o los Automated Clearing House Systems de la siguiente forma:

> Funds transfer system, primarily governed by the ACH Rules, **which provides for the clearing and settlement of batched electronic entries for participating financial institutions**. When referring to ACH systems, the terms in this regulation (such as "originating depository financial institution," "operator," "originating gateway operator," "receiving depository financial institution," "receiving gateway operator," and "third-party sender") are defined as those terms are defined in the ACH Rules. 12 CFR 233.2 (b).

De igual forma, allí se define *wire transfers* de la siguiente forma:

> A system **through which an unconditional order to a bank to pay a fixed or determinable amount of money to a beneficiary upon receipt, or on a day stated in the order, is transmitted by electronic or other means through the network, between banks, or on the books of a bank.** When referring to wire transfer systems, the terms in this regulation (such as "bank," "originator's bank," "beneficiary's bank," and "intermediary bank") are defined as those terms are defined in 12 CFR part 210, appendix B. 12 CFR 233.2 (cc).

Es decir, los ACH y los *Wire* son dos formas de hacer transferencias bancarias. Sin embargo, se diferencian, entre otras cosas, en la rapidez con

la que se efectúan, y en la manera en que internamente las instituciones financieras procesan los mismos, de aquí las distinciones en los requisitos que las gobiernan.

Finalmente, de manera somera Alproem aduce que FirstBank no le produjo el FACIL *User Guide* durante el descubrimiento de prueba, lo que constituyó un incumplimiento contractual que le impedía a FirstBank unilateralmente imponerle requisitos operacionales. Con relación a esta alegación, no nos puso en posición de considerarla con relación a la prueba documental contenida en las mociones dispositivas presentadas. A ello se opone que, de la lectura del expediente se concluye que Alproem fue debidamente orientado por FirstBank sobre el uso de la plataforma digital y la forma en la que se debían establecer los agentes autorizados, siguiendo los protocolos de seguridad establecidos por ley.

En definitiva, tal cual fue adjudicado en la Sentencia apelada, juzgamos que, examinada la prueba documental que tuvo ante su atención el foro primario, este caso era susceptible de su disposición por la vía sumaria, y la determinación final adoptada por el TPI encuentra apoyo en la documentación presentada por las partes, por lo que cabe confirmar.

## IV. Parte dispositiva

Por los fundamentos que anteceden, confirmamos la Sentencia apelada.

Lo pronunció y manda el Tribunal y lo certifica su Secretaria.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones